**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 26, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ROBERTO CORTEZ, SR.,

Defendant-Appellant.

No. 06-8078

(D.C. No. 01-CR-16-CAB)

(D. Wyoming)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE, McWILLIAMS,** and **GORSUCH**, Circuit Judges.

Defendant Roberto Cortez, Sr. (Defendant), appeals his conviction on one

count of conspiracy to possess with intent to distribute, and to distribute,

methamphetamine and marijuana, in violation of 21 U.S.C. §§ 841(a)(1),

(b)(1)(A), and 846; two counts of use of a telephone to facilitate a drug

trafficking offense, in violation of 21 U.S.C. § 843(b); and one count of

possession of methamphetamine with intent to distribute, and aiding and abetting,

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and 18 U.S.C. § 2. Defendant argues that (1) the government committed prosecutorial misconduct and violated his Sixth Amendment Confrontation Clause rights, Fed. R. Evid. 802, and his due process rights by questioning him at trial about incriminating statements that his son made to law enforcement; (2) the government committed prosecutorial misconduct and violated his due process rights by improperly bolstering the testimony of the government's witnesses; and (3) the district court abused its discretion under Fed. R. Evid. 801(d)(2)(E) and violated his Sixth Amendment Confrontation Clause rights by admitting statements made by his alleged coconspirators. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

I.

On January 23, 2001, Defendant was indicted on one count of conspiracy to possess with intent to distribute, and to distribute, methamphetamine and marijuana; two counts of use of a telephone to facilitate a drug trafficking offense; and one count of possession of methamphetamine with intent to distribute, and aiding and abetting. Defendant was not arrested at that time, as he could not be found. Three co-defendants were indicted on similar charges. One of these co-defendants, Roberto Cortez, Jr., was Defendant's son. The other two co-defendants were Thomas Sanchez and Eladio Cortez-Chavez, Defendant's nephew. Cortez, Jr., and Cortez-Chavez pled guilty on June 1, 2001, and received sentences of 168 months' and 108 months' imprisonment, respectively. Sanchez

2

pled guilty on May 31, 2001, and received a sentence of 108 months' imprisonment. In December 2004, the government placed Cortez, Jr., on escape status after he failed to return to his prison facility from a furlough. On April 7, 2005, the government arrested Defendant after locating him in Denver, Colorado, where he was using false identification and a fictitious name. Defendant pled not guilty to the 2001 charges, and the court held a James hearing[1] to determine the admissibility of various coconspirator statements at trial. As will be discussed in greater detail when addressing the final issue, the district court concluded that the statements of the coconspirators were admissible at trial.

Sanchez and Cortez-Chavez, Defendant's coconspirators, testified at Defendant's trial, as did Steve Williams, a coconspirator who had been previously charged. Each gave a history of their dealings with Defendant.

Sanchez testified that he began selling drugs for Defendant in Casper, Wyoming, in or around 1999. Sanchez was the middleman in several one-pound methamphetamine deliveries between Defendant, who was the source of the drugs, and Williams, a dealer. The three men lived in the same neighborhood in Casper, and Sanchez served as a translator between Defendant, who spoke Spanish, and Williams, who spoke English. Initially, Defendant told Sanchez to ask Williams if he would be interested in distributing a pound of

---

[1] See United States v. James, 590 F.2d 575, 582 (5th Cir. 1979).

3

methamphetamine for Defendant. Williams agreed, and Defendant, Cortez, Jr., and Cortez-Chavez delivered the drugs to Sanchez. Sanchez then delivered the methamphetamine to Williams and returned the drug proceeds to Defendant. Defendant paid Sanchez several hundred dollars for serving as the middleman in these drug transactions.

A few weeks after the successful distribution of the pound of methamphetamine, Williams asked Sanchez if he could get more methamphetamine. Sanchez spoke to Defendant, and once again they arranged for Sanchez to deliver the drugs to Williams and the drug proceeds to Defendant. This pattern was repeated every couple of weeks for about two months. After two months, Williams informed Sanchez that he was no longer interested in purchasing methamphetamine, and Sanchez conveyed the message to Defendant.

Williams testified that at some point he began dealing directly with Cortez, Jr., and Cortez-Chavez. He received one- to three-pound bricks of methamphetamine from them and re-sold the methamphetamine to his customers. Williams was arrested in November 1999 after law enforcement officers searched his house and found drugs and approximately $30,000 in cash.

In the fall of 2000, Defendant again contacted Sanchez about selling drugs. Sanchez agreed, but only wanted to sell marijuana. However, the first delivery of drugs that Sanchez received contained ten pounds of marijuana and one pound of methamphetamine. After a discussion with Defendant, Sanchez decided to keep

4

both the marijuana and the methamphetamine, but he had difficulty selling the methamphetamine because of its poor quality. Eventually, through a series of phone calls, Defendant agreed to exchange the poor quality methamphetamine for methamphetamine of better quality, and Cortez, Jr., delivered it. Sanchez obtained a total of three pounds of methamphetamine and ten pounds of marijuana from Defendant.

During this time, Defendant regularly came to Sanchez's house to collect money for the drugs. Sometimes, Cortez, Jr., or Cortez-Chavez would stop by to collect the drug proceeds. In December 2000, law enforcement officers executed a search warrant at Sanchez's house and seized both marijuana and methamphetamine. The agents questioned Sanchez at his residence, and he informed them that Cortez-Chavez was coming over to pick up drug proceeds. When Cortez-Chavez arrived, Sanchez made up an excuse for not having the money to pay him, and Sanchez asked Cortez-Chavez to have Defendant call him.

About twenty minutes later, Defendant called Sanchez and discussed the poor quality methamphetamine. The agents recorded this conversation in which Sanchez told Defendant that he was no longer interested in selling drugs. Defendant informed Sanchez that he was in Los Angeles, but could get more drugs if Sanchez wanted to sell more. A few days later, when Defendant called again, his call was again recorded. During this conversation, Sanchez told Defendant that he would accept more drugs to sell.

5

A few days later, Cortez, Jr., and Cortez-Chavez delivered a half-pound of methamphetamine to Sanchez. Law enforcement officers recorded and observed the transaction. About one week later, Defendant called Sanchez and asked for money for the previously distributed methamphetamine. The next day, Sanchez delivered $5,000 in pre-recorded government funds to Cortez, Jr. A few days later, Cortez, Jr., delivered another pound of methamphetamine to Sanchez. Law enforcement officers then arrested Cortez, Jr. and Cortez-Chavez. When he was arrested, Cortez, Jr., was in possession of the pre-recorded government funds.

By the time Sanchez and Williams testified at Defendant's trial, they had already served their sentences. Cortez, Jr., was on escape status, and as a consequence, was unavailable to testify.

Defendant testified at his trial. On direct examination, he denied any involvement with selling drugs and indicated that his son, Cortez, Jr., sold drugs. On cross-examination, the prosecutor questioned Defendant about his denial and the convenience of blaming his then-absent son for the drug distribution:

Q: Now, with respect to your son, it is your testimony that this was all your son; is that correct?

A: Well, yes.

Q: And your son is not here? He's not available, is he?

A: No.

Q: Do you know why?

6

A: Yes, I do know why.

Q: Why?

A: Because he escaped from prison. That's what his mom said.

Q: So it is pretty -

A: The real thing here is that I don't know how all that went down.

Q: I understand. So it is pretty convenient, then, isn't it, Mr. Cortez, to—convenient to pinpoint your son as the person involved or responsible for the drugs when he is the only one that hasn't appeared in court?

A: Well, yes.

ROA, Vol. 6, at 440-41. On re-direct, Defendant's counsel asked:

Q: Your son is not here because he's not here. Was that your doing or your fault that he's not here?

A: The question again, please.

Q: Would you like your son to be here?

A: Well, to be honest with you, yes, that would really help us clear up a lot of things.

Id. at 452. On re-cross, the prosecutor then asked Defendant:

Q: Mr. Senior [sic], you indicate that if your son were here he would be able to clear this all up, is that what you say?

A: Yes.

Q: To your favor, correct?

A: Well, be it like it may be, but things would be cleared up.

Q: In other words, he would say that you were not involved with

7

drugs?

A: Yes.

Q: And are you aware that your son gave a statement to law enforcement in which he said you distributed multiple pounds of methamphetamine?

Id. Defense counsel objected to this final question and stated that he had a Rule 802 motion to make. The district court sustained the objection before Defendant answered. The prosecution responded to the objection by stating:

> Your Honor, if I may be heard on that issue. I think this witness has opened the door about the son implying to the jury that he would come in here and clear things up, when the fact of the matter is he's given statements against his father implicating him in the case.

Id. at 453.

Out of the presence of the jury, defense counsel moved for a mistrial. The prosecution responded that Defendant opened the door to questioning concerning Cortez, Jr.'s prior statement inculpating Defendant by indicating that his son would exonerate him if he were present at trial to testify. The prosecution asserted that Defendant's testimony had the potential of misleading the jury because Cortez, Jr., actually implicated his father in the drug conspiracy in prior statements to the police. The court denied the motion for a mistrial after determining that Defendant had opened the door to further questioning by the prosecution. Defense counsel then requested a jury instruction stating that "any intimation or suggestion of the statement of [Defendant's] son is to be

8

disregarded and not considered by you as evidence in any way and - - ." Id. at 462.

The court agreed to provide a jury instruction on the issue at a later time. The court provided the following instruction at the close of the case:

> The questions asked by a lawyer for either party to this case are not evidence. If a lawyer asks a question of a witness which contains an assertion of fact, therefore, you may not consider the assertion by the lawyer as any evidence of that fact. Only the answers are evidence.
>
> You are further instructed that Roberto Cortez, Jr., is unavailable as a witness in this matter; therefore, you should not and may not speculate about what his testimony might be. Any statements made by either attorney concerning what Roberto Cortez, Jr., may have said are not evidence and you may not use these statements for any purpose whatsoever in deciding the case of the Defendant.

Id., Vol. 1, Doc. 156 at 50. In a separate instruction, the court also instructed the jury concerning questions by counsel: "Questions, objections, statements, and arguments of counsel are not evidence in the case, unless made as an admission or stipulation of fact." Id. at 45.

The jury convicted Defendant on all four counts and found, by special verdict, that the conspiracy involved at least 500 grams of a mixture or a substance containing a detectable amount of methamphetamine. The district court sentenced Defendant to 195 months' imprisonment on the conspiracy and distribution counts, and forty-eight months' imprisonment on the telephone facilitation counts, to run concurrently, followed by five years of supervised release.

9

II.

*Prosecutorial misconduct—questions regarding Cortez, Jr.*

Where "a defendant's motion for a new trial or mistrial is based on alleged prosecutorial misconduct during trial and the defendant objects contemporaneously, this court reviews for an abuse of discretion." United States v. Green, 435 F.3d 1265, 1267-68 (10th Cir. 2006), cert. denied, 547 U.S. 1122 (2006). This court applies a two-part test to determine the merits of a claim of prosecutorial misconduct. United States v. Apperson, 441 F.3d 1162, 1207 (10th Cir. 2006), cert. denied, 127 S. Ct. 1003 (2007). "First, we decide whether the conduct was improper." Id. (citations and internal quotation marks omitted). "Second, we decide whether the conduct, if improper, warrants reversal." Id. (citations and internal quotation marks omitted).

We are inclined to agree with the government that Defendant opened the door to the prosecutor's line of questioning, and we have serious doubts that the prosecutor's conduct was improper. However, even assuming, *arguendo*, that the prosecutor improperly asked Defendant about the incriminating statements from Chavez, Jr., to law enforcement officers, the prosecutor's conduct "was not 'flagrant enough to influence the jury to convict on grounds other than the evidence presented.'" United States v. LaVallee, 439 F.3d 670, 696 (10th Cir. 2006) (quoting United States v. Meienberg, 263 F.3d 1177, 1180 (10th Cir. 2001)). The second prong of the test for analyzing a claim of prosecutorial

10

misconduct "focuses on 'whether the prosecutor's conduct affected the fairness of the trial.'" Apperson, 441 F.3d at 1207 (quoting United States v. Kravchuk, 335 F.3d 1147, 1153 (10th Cir. 2003)). "Prosecutorial misconduct is considered harmless 'unless there is reason to believe it influenced the jury's verdict.'" Green, 435 F.3d at 1268 (quoting United States v. Gabaldon, 91 F.3d 91, 94 (10th Cir. 1996)). "'In assessing whether the misconduct [influenced the jury's verdict] we consider the trial as a whole, including the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case.'" Id. (quoting Gabaldon, 91 F.3d at 94) (alteration in original).

In Defendant's case, the prosecutor's alleged misconduct was not extensive. It was an isolated question, to which the court sustained defense counsel's objection, and to which Defendant never supplied an answer. Defendant did not testify further, and the prosecutor did not ask any additional questions on the subject. "We ordinarily will not reverse if the misconduct was merely 'singular and isolated.'" United States v. Ivy, 83 F.3d 1266, 1288 (10th Cir. 1996) (quoting United States v. Pena, 930 F.2d 1486, 1491 (10th Cir. 1991)).

In addition, the district court responded with appropriate curative instructions. The court instructed the jury that questions asked by the counsel for either party were not evidence and that because of Cortez, Jr.'s unavailability, "[a]ny statements made by either attorney concerning what Roberto Cortez, Jr., may have said are not evidence and you may not use these statements for any

11

purpose whatsoever in deciding the case of the defendant." ROA, Vol. 1, Doc. 156 at 50. The court also instructed the jury as follows:

> When the Court has sustained an objection to a question addressed to a witness, the jury must disregard the question entirely, and may draw no inference from the wording of it or speculate as to what the witness would have said if he had been permitted to answer any question.

Id., Vol. 1, Doc. 156 at 52. "Jurors are presumed to follow the judge's instructions." United States v. Templeman, 481 F.3d 1263, 1266 (10th Cir. 2007); see also United States v. Gordon, 173 F.3d 761, 769 (10th Cir. 1999) ("Absent evidence to the contrary, we assume the jury follows a curative instruction."). The district court's curative instructions dispelled any prejudice that might have resulted from the alleged prosecutorial misconduct.

Moreover, the alleged misconduct played only a minor role in the case as a whole. "A prosecutor's improper statement to the jury is harmless unless there is reason to believe that it influenced the jury's verdict." United States v. Maynard, 236 F.3d 601, 606 (10th Cir. 2000) (quoting Ivy, 83 F.3d at 1288). "Thus, '[a]bsent a showing of prejudice to the defendant, prosecutorial misconduct alone will not support a finding that the trial court abused its discretion.'" Id. (quoting United States v. Novak, 918 F.2d 107, 110 (10th Cir. 1990)) (alteration in original). The prosecution's case against Defendant was quite strong. Three of Defendant's coconspirators testified against Defendant, his voice was recorded discussing drug trafficking during the course of the conspiracy, and the

12

government seized large quantities marijuana, methamphetamine, and cash from the drug distribution ring.

Defendant relies upon Maynard as support for his prosecutorial misconduct claim, but such reliance is misplaced. In Maynard, 236 F.3d at 604-06, this court determined that the government committed prosecutorial misconduct in asking a defendant about the whereabouts of a man that the defendant had previously threatened to kill. The government knew that the man was deceased, and the defendant responded, in front of the jury, that the man was dead. Id. This court agreed with the defendant that the prosecutor's question was improper, but determined that reversal of the defendant's conviction was not warranted because "there was an overwhelming body of evidence developed against the defendant," and "the trial judge promptly gave an extremely strong curative instruction to the jury immediately after the bench conference following [the] testimony." Id. at 606-07. While the curative instruction specifically addressing references to Cortez, Jr., was not given until the close of evidence, the government's alleged misconduct in this case was far less harmful than the misconduct at issue in Maynard.

When the evidence presented at Defendant's trial is viewed in its entirety, we cannot conclude that the prosecutor's alleged misconduct influenced the jury's verdict. In addition, the district court did not abuse its discretion in denying Defendant's motion for a mistrial.

13

*Prosecutorial misconduct—alleged bolstering of witnesses*

Defendant next argues that the government improperly bolstered the testimony of the government's witnesses by introducing the plea agreements signed by the co-defendants who testified at Defendant's trial.

Defendant's argument lacks merit. "It is a due process error for a prosecutor to indicate 'a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not yet presented to the jury supports the witness' testimony.'" United States v. Jones, 468 F.3d 704, 707 (10th Cir. 2006) (quoting United States v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990)). However, "[i]t is well established that prosecutors may admit plea agreements, even those which include truthfulness provisions, without violating the dictates against vouching." Id. "'Use of the 'truthfulness' portions of these agreements becomes impermissible vouching only when the prosecutors explicitly or implicitly indicate that they can monitor and accurately verify the truthfulness of the witness' testimony.'" Id. (quoting Bowie, 892 at 1498).

Here, the prosecutor did not improperly vouch for Sanchez, Williams, or Cortez-Chavez. The prosecutor questioned Sanchez about certain aspects of his plea agreement. Sanchez testified that he pled guilty to a charge of drug conspiracy and that, as part of his plea agreement, he agreed to cooperate with the United States and testify truthfully if called as a witness. Sanchez commented

14

that his sole obligation at trial was to tell the truth and that if he lied, he was aware that he could be subject to perjury charges. Sanchez also testified that his sentence was reduced in exchange for cooperating with the government and that the government had promised to recommend a reduction in his supervised release if he testified truthfully. The court received Sanchez's plea agreement into evidence. The prosecutor's questioning of Williams and Cortez-Chavez regarding each of their plea agreements closely resembled the questioning of Sanchez. As regards the prosecutor's questioning of witnesses, our facts mirror those in United States v. Magallanez, 408 F.3d 672, 680 (10th Cir. 2005), where we held:

> the record shows that the prosecutor's references to credibility were limited to asking each witness if his or her plea agreement contained an obligation to testify truthfully. The prosecutor did no more than reveal the language of the plea agreement and the obligations within those agreements to testify truthfully. Such actions are not prosecutorial misconduct.

Likewise, by questioning its witnesses regarding the terms of their plea agreements, the prosecution in the present case did not improperly bolster the witnesses' testimony.[2]

---

[2] The government also correctly argues that this court has "regularly approved the introduction of evidence of a coconspirator's guilty plea to assess the coconspirator's credibility and show an acknowledgment by the witness of participation in the offense," so long as the district court instructs the jury that "a guilty plea by a coconspirator may not be used as substantive evidence of a defendant's guilt." United States v. Massey, 48 F.3d 1560, 1569 (10th Cir. 1995). In the present case, the court instructed the jury that "[t]he fact that an accomplice has entered a guilty plea to the offense charged is not evidence of the
(continued...)

15

*Admissibility of coconspirator's statements*

Finally, Defendant argues that a January 2001 statement from Cortez, Jr., to Sanchez about Defendant being the source of the drugs was not made during the conspiracy or in furtherance of the conspiracy because, at the time the statement was made, Sanchez was cooperating with the government. In the alternative, he argues that even if the district court properly admitted the statement under Fed. R. Evid. 801(d)(2)(E),[3] the statement was testimonial and its admission violated the Confrontation Clause of the Sixth Amendment.

We review the district court's decision to admit statements of coconspirators for an abuse of discretion. United States v. Eads, 191 F.3d 1206, 1210 (10th Cir. 1999). Under Rule 801(d)(2)(E), a statement is not hearsay "if the court finds: '1) a conspiracy existed; 2) both the declarant and the defendant against whom the declaration is offered were members of the conspiracy; and 3) the statement was made in the course of and in furtherance of the conspiracy.'" Eads, 191 F.3d at 1210 (quoting United States v. Caro, 965 F.2d 1548, 1557 (10th Cir. 1992)). We review a district court's finding that a statement was in furtherance of a conspiracy for clear error. United States v. Gutierrez, 48 F.3d

---

[2](...continued)
guilt of any other person." ROA, Vol. 1, Doc. 156 at 59.

[3] Rule 801(d)(2)(E) provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

16

1134, 1137 (10th Cir. 1995). "In making its preliminary factual determination as to whether a conspiracy exists, the court may consider the hearsay statement sought to be admitted, along with the independent evidence tending to establish the conspiracy." United States v. Lopez-Gutierrez, 83 F.3d 1235, 1242 (10th Cir. 1996).

Prior to Defendant's trial, the district court held a James hearing to determine the admissibility of coconspirator statements in accordance with Rule 801(d)(2)(E).[4] At this hearing, Defendant argued that many of the statements were inadmissible because the conspiracy ended when Sanchez began to cooperate with the police in December 2000 and that statements made by Cortez, Jr., and Cortez-Chavez to Sanchez after this date were not in furtherance of the conspiracy. The court found, by a preponderance of the evidence, that a conspiracy existed, and that Defendant was a member of this conspiracy, as were Sanchez, Cortez-Chavez, Williams, and Cortez, Jr. The court determined that Defendant, Cortez, Jr., Cortez-Chavez, Williams, and Sanchez made a number of statements in furtherance of the conspiracy in December 2000 and January 2001, discussing the delivery and sale of drugs and their distribution, and the court

---

[4] "Under Tenth Circuit law, a district court can only admit coconspirator statements if it holds a James hearing or conditions admission on forthcoming proof of a 'predicate conspiracy through trial testimony or other evidence.'" United States v. Townley, 472 F.3d 1267, 1273 (10th Cir. 2007) (quoting United States v. Owens, 70 F.3d 1118, 1123 (10th Cir.1995)).

determined that the statements would be admissible at trial.

At trial, Sanchez testified that sometime during the week of January 8, 2001, Cortez, Jr., told him that Defendant had supplied the half-pound of methamphetamine delivered to Sanchez the week before. Defendant objected to this statement at trial and asserts on appeal that because this statement was improperly admitted, he is entitled to a reversal of his conviction.

We agree with the government that the district court properly admitted the statement. Rule 801(d)(2)(E) "does not embody a requirement that the statement in question 'be made by a coconspirator to a coconspirator.'" United States v. Williamson, 53 F.3d 1500, 1519 (10th Cir. 1995) (citations omitted). As this court held in Williamson,

> the fact that one party to a conversation is a government agent or informer does not of itself preclude the admission of statements by the other party—if he or she is a member of a conspiracy—under Rule 801(d)(2)(E). Stated alternatively, in deciding whether statements are admissible under Rule 801(d)(2)(E), the appropriate focus is on whether the statements were 'made by' a member of the conspiracy, and not on whether the statements were 'made to' a member of the conspiracy.

Id. (citation and some internal quotation marks omitted). Cortez, Jr., who was a member of the conspiracy, made the statement at issue, and the district court admitted the statement against Defendant, who was also a member of the conspiracy. "Rule 801(d)(2)(E) only requires that the declarant . . . and the defendant (i.e., the coconspirator on trial against whom the statement is being

18

offered . . .) be members of the conspiracy." Id.

Moreover, Cortez, Jr., made the statement in furtherance of the conspiracy. "Statements by a conspirator are in furtherance of the conspiracy when they are 'intended to promote the conspiratorial objectives.'" Townley, 472 F.3d at 1273 (quoting United States v. Reyes, 798 F.2d 380, 384 (10th Cir. 1986)). These include "[s]tatements of a coconspirator identifying a fellow coconspirator," id. (quoting United States v. Gomez, 810 F.2d 947, 953 (10th Cir. 1987)) (alteration in original), such as the statement at issue here. In addition, the record shows that Cortez, Jr., made this statement intending to promote the conspiratorial objective of distributing and collecting proceeds from the sale of illegal drugs. See Reyes, 798 F.2d at 383-84 (holding that, where a coconspirator told a government informant that the defendant was "sponsoring the purchase and distribution of cocaine," the coconspirator made the statement in furtherance of the conspiracy). Cortez, Jr.'s statement to Sanchez, identifying Defendant as the source of the methamphetamine, was in furtherance of the conspiracy, and the district court did not abuse its discretion in admitting the statement under Rule 801(d)(2)(E).

Defendant also argues that, even if the district court properly admitted Cortez, Jr.'s, statement under Rule 801(d)(2)(E), the statement violated Defendant's Confrontation Clause rights under the Sixth Amendment. Under the Supreme Court's "testimonial" approach to the Confrontation Clause, first announced in Crawford v. Washington, 541 U.S. 36 (2004), the Confrontation

19

Clause "bars testimonial out-of-court statements unless the witness is unavailable and the defendant had a prior opportunity to cross-examine." United States v. Ramirez, 479 F.3d 1229, 1249 (10th Cir. 2007) (citing Crawford, 541 U.S. at 68). "Although the Supreme Court declined to precisely define 'testimonial,' the Court explicitly noted that, historically, 'statements in furtherance of a conspiracy' present an 'example' of 'statements that by their nature [a]re not testimonial.'" Id. (quoting Crawford, 541 U.S. at 56, 68). In addition, as we explained in Ramirez, "the Court in Crawford cited Bourjaily with approval as one of several recent cases that 'hew closely to the traditional line.'" Id. (quoting Crawford, 541 U.S. at 58). In Bourjaily v. United States, 483 U.S. 171, 183-84 (1987), the Court held that "the Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)." We conclude that Cortez, Jr.'s statement to Sanchez, identifying Defendant as the source of the methamphetamine, was not testimonial, and its admission did not violate the Confrontation Clause.

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

20